**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MAXIMUM MARKETING, INC.,**
**a for Profit Florida corporation,**

               **Plaintiff,**                        **CASE NO.: 24-CV-61873-WPD**

**v.**

**REVIVA LABS, INC., a for Profit**
**New Jersey Corporation, RENEE**
**VIDAL, SENDAYCO LLC,**

               **Defendants.**
_____/

**RESPONSE IN OPPOSITION TO SENDAYCO, INC.'S MOTION TO DISMISS**
**PLAINTIFF'S COMPLAINT AND MOTION TO STRIKE PLAINTIFF'S CLAIM FOR**
**ATTORNEY FEES**

      **COMES NOW** the Plaintiff, Maximum Marketing, Inc., by and through the undersigned

attorney of record, and files this Response in Opposition to Sendayco, LLC's Motion to Dismiss

Plaintiff's Complaint and Motion to Strike Plaintiff's Claim for Attorney Fees and states as

follows:

      The Plaintiff, Maximum Marketing, Inc. (hereinafter "Maximum"), previously filed an

action against Reviva Labs, Inc. (hereinafter "Reviva") for breach of contract in the Seventeenth

Judicial Circuit In And For Broward County, Florida, under Case Number CACE19011452. Case

Number CACE19011452 was assigned to the Honorable Martin J. Bidwell. On April 11, 2023,

through May 17th, 2023, the Honorable Judge Bidwell presided over the bench trial between the

parties. The Court ruled that, "As Maximum has proven its claim for breach of contract, Maximum

is entitle damages." (See Case 0:24-cv-61873-WPD Document 1-1 Entered on FLSD Docket

10/08/2024 Pages 17 through 36 Plaintiffs Complaint, Exhibit 2, Para. 47 of the Judicial Findings

After Bench Trial.)

On June 17, 2024, after Judge Bidwill entered the April 30, 2024 Judicial Finding After Bench Trial, determining that Reviva owed damages to Maximum in the amount of $477,488.00, Renee Vidal, Esq., as Trustee of the stocks and President of Reviva, sold the "operating assets" owned by Reviva to Sendayco LLC (hereinafter "Sendayco"), located at 1788 South Metro Parkway, Dayton, OH 45469. (See Exhibit 3 attached to the Complaint, Affidavit of Renee Vidal, Esq., Case No.: CACE 19-011452(05)). Renee Vidal, Esq. had actual knowledge that Reviva was found liable to Maximum in the amount $477,488.00 plus, potentially, prejudgment interest and attorney's fees and costs pursuant to the Court's ruling dated April 30, 2024. Defendant Renee Vidal was responsible for selling the assets of Defendant Debtor Reviva to Sendayco in a plan devised to strip all valuable assets of Reviva, thereby denying the ability of Maximum to collect the funds it is lawfully entitled to collect. Defendants Vidal and Reviva embarked upon a scheme to strip the operational assets of Reviva, thereby rendering Defendant Reviva insolvent. Defendant Renee Vidal was not merely a third-party lawyer transacting the fraudulent sale of Reviva assets. Defendant Vidal was the president of Defendant Reviva Labs, the trustee of all of the shares of the decedent Judith Strassler.

Defendant Sendayco contends the sale of Defendant Reviva's operating assets was authorized by the New Jersey Probate Court and overseen by the Courts. This allegation is inaccurate and untrue. The Probate Court authorized the sale of the assets of Defendant Reviva based upon the Defendant Renee Vidal, Esq.'s representations set forth in the Certification In Support of the Executor's Motion for Specific Authority to Sell the Assets of Reviva Labs, Inc. and for Approval of Agreement of Sale dated June 2024 (attached hereto as Exhibit 1). The court order authorizing the sale of the operational assets does not have any requirements or conditions that the sale be overseen by the Court. The laws of the State of New Jersey require corporations to

satisfy and discharge debts and other liabilities, pursuant to NJ Rev Stat § 14A:12-9 (2023). Defendant Vidal represented to the Court that the proceeds of the sale would be held by the company pending final resolution of the Maximum claim, and any other claims, as required by New Jersey Law. (See Exhibit 1, pp. 9, 10, and 13).

Prior to the filing of this case *sub judice*, Counsel for the Plaintiff in the State case sent a written request via email to Defendant Renee Vidal, Esq. on September 13, 2024, requesting confirmation that the proceeds of the sale had been securely held to pay the debt which had been judicially established before the Honorable Martin Bidwell. Included with the email was a copy of the Complaint for Violation of the Fraudulent Transfer Act. Defendant Renee Vidal, Esq. failed to respond to the request for confirmation that funds were being held for the debt to Maximum and to wind up the affairs of Reviva.

Defendant Sendayco LLC, an Ohio Limited Liability Company, contends it is an arm's length bona fide purchaser of the operational assets of the Reviva. The Complaint alleges that, in fact, Sendayco is not a bona fide purchaser. Under Ohio law, a bona fide purchaser is defined as "a purchaser who `takes in good faith, for value, and without actual or constructive notice of any defect.'" In re Easter, 367 B.R. 608, 612 (Bankr. S.D. Ohio 2007) (citing In re Little Key, 292 B.R. 879, 883 (Bankr. S.D. Ohio 2003) (citing Shaker Corlett Land Co. v. City of Cleveland, 139 Ohio St. 536 (1942))). As alleged, Everingham & Kerr, Inc. brokered the transaction between Reviva and Sendayco.

Prior to the sale of the operational assets on June 5, 2024, counsel for the Plaintiff, Melanie Cambridge, Esq., sent a letter via Federal Express to Everingham & Kerr, Inc. disclosing the seller, Defendant Debtor Reviva was indebted to the Plaintiff in an amount of $477,488.00 plus attorney's fees, costs and prejudgment interest yet to be determined, and the brokered transaction will be

challenged as an illusory transfer of assets. (See, Exhibit 5 attached to the Complaint). The enclosure with the letter was an accurate copy of Judge Martin Bidwell's Judicial Findings After Bench Trial entered on April 30, 2024. On June 5, 2024, counsel for the Plaintiff, Melanie Cambridge, Esq., sent a letter via Federal Expressed to Sendayco disclosing that the seller, Defendant Debtor Reviva was indebted to the Plaintiff in an amount of $477,488.00 plus attorney's fees, costs and prejudgment interest yet to be determined and the brokered transaction will be challenged as an illusory transfer of assets.  (See, Exhibit 8 attached to the Complaint) The enclosure with the letter was an accurate copy of Judge Martin Bidwell's Judicial Findings After Bench Trial entered on April 30, 2024. On July 1, 2024 Everingham & Kerr, Inc. confirmed it was in fact the broker of the sale of assets between the Defendant Debtor Reviva Labs, Inc. to Sendayco LLC via a press release of the sale. (See, Exhibit 4 attached to the Complaint).

Sendayco is not an innocent purchaser. Innocent purchasers of property who purchase for value without notice of any other party's claim against the property are good faith bona fide purchasers. Sendayco LLC had actual notice of the liability prior to the sale of the operational asset but chose to ignore the claim. The trustee may not obtain bona fide purchaser status if he had actual or constructive notice of the transfer at the commencement of the bankruptcy proceeding. In re Brown Family Farms, Inc., 80 B.R. 404, 408 (Bankr. N.D. Ohio 1987), aff'd, 872 F.2d 139 (6th Cir. 1989). Pursuant to Ohio law, Sendayco does not qualify as a good faith bona fide purchaser.

It is the Plaintiff's contention that including Sendayco as an indispensable party in this litigation was required due to the fact the relief requested pursuant to the Florida Uniform Fraudulent Transfer Act, Fla. Stat. § 726.101, Et Seq. ("FUFTA") includes the avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim and an attachment or other provisional remedy against the asset transferred or other property of the transferee in

accordance with applicable law. Florida case law has defined "indispensable parties" to a lawsuit as "'[p]ersons who have not only an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience.' Shields v. Barrow, 58 U.S. (17 How.) 130, 15 L.Ed. 158, 160 (1854)." Phillips v. Choate, 456 So.2d 556, 557 (Fla. 4th DCA 1984). Therefore, recognizing the due process rights of Sendayco, it was included and served process participate in these judicial proceedings. Although there is no basis for Personal Jurisdiction, the Defendant Sendayco was provided with the opportunity to participate in the case to protect its financial interests. Sendayco certainly has a financial interest in the outcome of these proceedings.

Since the sale, Defendant Renee Vidal, Esq. amended the address of Defendant Debtor Reviva to 8000 Midlantic Drive, Suite 3005, Mt Laurel Township, NJ 08054. The address is the law offices of Capehart & Scatchard, P.A., which is the employer of Defendant Renee Vidal, Esq. The Defendant Debtor Reviva is no longer engaged in commerce. The Defendant Rene Vidal, Esq. also changed the name of Defendant Reviva to Carnetrine, Inc. in Defendant's Notice of Change of its Corporate Name, Filing #2042387792 E-Filed 08/09/2024; Circuit Court Seventeenth Judicial Circuit, Broward County, Florida, Case No.: 19-011452 (05). Defendant Reviva is no longer operating a business; instead, Defendant Sendayco is selling the Reviva Labs brand of products. Additionally, William Levins, the former president of Reviva, has become the Vice President of Marketing of Sendayco, and Nancy Reimer, the former Director of Education and Training has continued her position with Sendayco (See, Exhibit 7 attached to the Complaint). Defendant Sendayco should be considered an alter ego of the Defendant Reviva and subject to discovery. Sendayco is the purchaser of the assets of the Defendant Debtor Reviva, including but

not limited to the production line of products, the trade name the products are sold under, the packaging of the products, the intellectual property, the marketing internet online presence, the patents, formulas, and intellectual property.

The actions of Defendants Renee Vidal, Esq. and Reviva transacted with the fraudulent intent of transferring assets to Defendant Sendayco to deny the Plaintiff Maximum from collecting the funds lawfully owed by the Debtor Reviva to the Plaintiff. As a result, Defendant Debtor Reviva is insolvent. In adopting the Uniform Fraudulent Transfer Act ("UFTA"), the Florida Legislature recognized the need to protect a creditor from an insolvent debtor who, during or in anticipation of litigation, transferred assets to render himself judgment proof. In essence, the law realized that an insolvent debtor may attempt to engage in a variety of transfers of property (both initially and through subsequent transfers by the first transferee) and thereby prevent an ultimately successful litigant from collecting a judgment obtained prior to such transfers.  The overriding purpose of the Florida Uniform Fraudulent Transfer Act ("FUFTA") is to permit a creditor to commence and prosecute an action to set aside a fraudulent transfer without having to wait until the end of the underlying case. It is well settled that the FUFTA provides a creditor with remedies prior to the rendering of a final judgment.

Florida also holds that a pre-existing judgment is not a requirement to the commencement of a fraudulent transfer action. See, e.g., Varveris v. Alberto M. Carbonell, P.A., 773 So. 2d 1275, 1276 (Fla. 3d DCA 2000) (injunction under the FUFTA can be entered before effectuation of personal service); Cook v. Pompano Shopper, Inc., 582 So. 2d 37, 40 (Fla. 4th DCA 1991); Money v. Powell, 139 So. 2d 702 (Fla. 2d DCA 1962) (Florida protects contingent creditors against fraudulent transfers as fully as holders of absolute claims). Cf. Invo Florida, Inc. v. Somerset Venturer, Inc., 751 So. 2d 1263 (Fla. 3d DCA 2000) (contemplating that claims for breach of

contract and fraudulent transfer would go forward in the same action). As explained above, one of the purposes behind permitting a party to pursue the underlying action and simultaneously seek to set aside a fraudulent transfer is to allow the holder of a judgment a better chance to satisfy it. See, Intili v. DiGiorgio, 693 A. 2d 573 (N.J. Super. Ct. Ch. Div. 1997).

In accordance with the intent underlying the FUFTA that creditors should be protected from the fraudulent machinations of debtors, the type of claim under which a party may bring a fraudulent transfer action is defined broadly. As defined in the FUFTA, a claim means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Fla. Stat. §726.102(3).

The Plaintiff concedes the objection to the request for attorneys' fees.

**WHEREFORE**, the Plaintiff requests this Court deny Defendant Sendayco LLC's Motion to Dismiss Plaintiff's Complaint and Motion to Strike Plaintiff's Claim for Attorney Fees. Alternatively, the Plaintiff requests the opportunity to file an Amended Complaint, thereby dismissing the complaint without prejudice or alternatively transferring venue.

Respectfully Submitted,

/s/ *Edward A. Martinez*
Edward A. Martinez, Esq.
Attorney for the Plaintiff
Florida Bar No. 618195

The Martinez Law Center, LLC
7600 West 20th Avenue, Suite 220
Hialeah, Fl 33016
Telephone: 786-567-8757
martinezgroupmiami@gmail.com

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished on

October 31, 2024, via electronic mail and/or regular mail and/or hand delivered and/or facsimile

to the Attorney for the Defendants.

Respectfully Submitted,

/s/ *Edward A. Martinez*
Edward A. Martinez, Esq.
Attorney for the Plaintiff

Yasmeen S. Khaleel, Esquire (023411995)
William G. Wright, Esquire  (022481980)
**Capehart & Scatchard, P.A.**
Laurel Corporate Center
8000 Midlantic Drive, Suite 300S
P.O. Box 5016
Mount Laurel, NJ  08054-5016
(856) 234-6800
<u>Attorneys for me, Renee C. Vidal, Executor and Trustee UWO Judith Strassler, deceased</u>

| | |
|---|---|
| **In The Matter Of The Estate**<br><br>**Judith Strassler, Deceased** | Superior Court Of New Jersey<br>Chancery Division-Probate Part<br>Camden County<br><br>Docket No.: CP-0018-2020<br><br>Civil Action<br><br>**Certification In Support of Executor's Motion For Specific Authority to Sell The Assets of Reviva Labs, Inc. And For Approval of Agreement of Sale** |

Renee C. Vidal, of full age, by way of Certification, says:

1.      I am the duly appointed Executor of the Estate of Judith Strassler, deceased, and as Trustee of the Reviva Trust created by Article Third, Section C, of the Last Will and Testament dated November 7, 2019, to hold the stock of Reviva Labs, Inc. and to operate the company pending sale. A true copy of the Will is attached as **<u>Exhibit "A".</u>**

2.      I am submitting this certification in support of my Motion for Specific Authority to Sell the Assets of Reviva Labs, Inc. and for Approval of the Agreement of Sale.

A.      <u>**General Background.**</u>

3.      On November 24, 2020, the Surrogate of Camden County appointed me as the Executor of the Estate of Judith Strassler, deceased, and as the Trustee of the Reviva Trust. The Surrogate also appointed me as Trustee of two other trusts created under the Will.

assets of $1,061,506, for a debt-to-assets ratio of 1.117, indicating a significant decline in the financial health of the company.

23.     Upon Ian Strassler's departure from management of Reviva Labs, Inc., Decedent assumed the position of chief executive officer and appointed William Levins as President of the corporation, effective June 1, 2018.

24.     Between the time that William Levins was appointed as President and Decedent's death on January 20, 2020, Reviva struggled to manage the debt that accumulated during Ian Strassler's tenure, along with declining sales.

25.     Of significant impact was the loss of two major accounts during Ian Strassler's tenure – GNC and Ulta – whose combined sales accounted for approximately $720,000 of Reviva's revenue in 2016, but $0 revenue by 2018.

26.     At the time of Decedent's death, Reviva had debt of $1,037,962 and assets of $1,154,491 for a debt-to-assets ratio of 0.922.

27.     On the date of Judith Strassler's funeral, Ian Strassler left the wake and entered the Reviva property.  Following an interception by the police, Reviva was ordered to close until a Court Order was obtained.

28.     I, as the executrix-elect under the Will and the trustee-elect under the Will, filed a Complaint in the Superior Court, Chancery Division, seeking relief to re-open Reviva and maintain the status quo of the operations of Reviva prior to Decedent's death.  That action ultimately resulted in Reviva re-opening with a status quo Order in place.

29.     Reviva has continued to pay down the legacy debt that was built up over the tenure of Ian Strassler as CEO.

30.     The company struggled to operate through the global pandemic and the COVID-19 shutdowns, which brought component and ingredient shortages and increases in the costs of those items, as well as most recently, rising interest rates and inflation which has significantly impacted sales not only for Reviva, but across the industry.

31.     As of March 31, 2024, the company had debt (exclusive of the pending lawsuit referenced below) of $597,220, and assets of $894,211 for a debt-to-asset ratio of 0.6678.

32.     The ongoing payment of the legacy debt has created a cash flow issue for the company, and although the company has significantly reduced expenses, it continues to face a cash flow issue, which in addition to the legacy debt, was compounded by the ongoing battles created by the supply chain disruptions from the pandemic and the sales disruptions from the rising inflation, its inability to access capital and the concerns surrounding the instability of the economy.

## C.     Court Approval to Commence Marketing.

33.     Upon my appointment on November 24, 2020, I assumed from the Temporary Administrator the role of overseeing and managing the operations of Reviva.

34.     My core responsibilities included setting and executing Reviva's strategy and leading, guiding, and directing the work of Reviva's president, who in turn is overseeing the day-to-day operations and other employees. My services in this regard including (a) managing the business, (b) arranging for the preparation and filing of tax returns, (c) handling relations with Reviva's lender, (d) communicating with the Company's other professionals, (e) marketing and selling the business, and (f) overseeing and managing the Company's litigation.[1]

35.     Article Third, Section C, of the Will instructed the Executor to sell the stock or substantially all of the assets of Reviva as soon as practicable after the Decedent's death. That instruction is conditioned by the following acknowledgment: "I understand that although this is my request, that it may require the operation of the company for some period of time to sell the stock or assets and my Trustee has the sole and absolute discretion to determine the time, terms and conditions of such sale."

36.     As alluded to above, Glenn Henkel, as Temporary Administrator, engaged Michael Saccomanno of Friedman, LLP to provide a valuation of Reviva Labs, Inc. On June 12, 2020, Mr. Saccomanno

---

[1]     I have a Bachelor of Science in finance from Penn State.  I managed hotels and a restaurant for several years before attending law school.  In addition to my Juris Doctor, I have an L.L.M. in taxation.

provided a valuation report concluding that as of January 19, 2020, the value of Reviva Labs, Inc., including the real estate at 705 Hopkins Road, Haddon Township, New Jersey, was $1,216,000.

37.     By the Order entered on May 3, 2021, the Court directed me to "commence the process of selling Reviva Labs, Inc."

38.     In compliance with that direction, I engaged the services of Everingham & Kerr, business consultants and brokers, to assist in identifying suitable candidates for the purchase of the stock or assets of Reviva.

39.     On October 29, 2021, I filed a Second Verified Complaint for Advice and Direction along with an Order to Show Cause. In Count Three of that Complaint, in Count Three of that Second Verified Complaint, I sought confirmation from the Court of my authority to sell the stock or all or substantially all of the assets of Reviva,

40.     In that same Count, I stated that, if and when I was presented with an agreement of sale of the stock or of all or substantially all of the assets of Reviva that I found acceptable, I would require that the agreement be contingent on my obtaining from the Court approval of that agreement and I would then apply to this Court for such approval.

41.     On November 17, 2021, the Court entered an Order requiring the interested parties to show cause why the relief that I demanded in the Second Verified Complaint, including the relief sought in Count Three, should be granted.

42.     The Second Verified Complaint and the November 17, 2021 Order to Show Cause were duly served on the interested parties.

43.     On January 28, 2022, the return date of the Order to Show Cause, the Court granted from the bench the relief sought in the Verified Complaint, including Count Three.

44.     On February 1, 2022, the Court signed an Order to that effect, a copy of which is attached as **Exhibit "C."**.

6

45.     Paragraph number 3 of that Order provides:

Regarding Count Three - Petitioner's general authority to sell the stock or all or substantially all of the assets of Reviva Labs, Inc. is hereby confirmed; provided, however, that Petitioner must move before this Court for specific authority to sell the stock or all or substantially all of the assets of Reviva Labs, Inc. and for approval of the agreement of sale before any such sale may be consummated.

**D.   Commencement of Marketing.**

46.     I along with the president of Reviva, William Levins, and other employees gathered a substantial amount of information to assemble a confidential seller memorandum.

47.     In August 2021, following a confidential company review, there were 78 companies that expressed initial interest and signed non-disclosure agreements to receive confidential information about the company.

48.     Of those companies, three submitted formal letters of intent to purchase the assets of Reviva. In addition, Ian Strassler expressed interest in purchasing the company at that time but did not submit a letter of intent.

49.     On September 15, 2021, a confidential letter of intent was executed with BUYER1 and the due diligence process was initiated.

50.     On November 8, 2021, BUYER1 notified me that they could not proceed with the transaction, and I terminated the Letter of Intent.

51.     In December 2021, I opened the process back to one of the other companies that had submitted a letter of intent in September.

52.     In January 2022, a confidential letter of intent was executed with BUYER2 and the due diligence process was initiated with BUYER2.

53.     At that time, Ian Strassler again indicated that he was interested in purchasing the company, but his offer price was a fraction of the offer of BUYER2 and his offer lacked any terms other than a price.

54.    Because BUYER2 was intending to purchase both the real estate as well as the other tangible and intangible assets, the due diligence process was delayed as a result of zoning issues with respect to the real property.

55.    In September 2022, BUYER2 terminated the transaction because the sales of Reviva had declined over the period of due diligence and concern over the unresolved litigation matter (see Part E).

56.    The rise in interest rates starting in late Spring/early Summer 2022 spurred significant price increases in the supply chain and changes in consumer behaviors, which had an impact on Reviva's sales. This was the nail in the coffin that killed the deal with BUYER2. Thus, although Reviva's sales started off well in early 2022, by May, sales were tempering along with concern over the economy causing BUYER2 to pull the plug.

57.    Following the termination of the transaction with BUYER2, I conferred with Everingham and Kerr about continuing efforts to sell the company. Those discussions identified several issues that hampered the sale of Reviva including:

    A.  lack of profitability of the company (primarily because of the legacy debt, but also the result of declining sales over recent months);

    B.  the current unresolved litigation matter creating uncertainty as to the company's liabilities;

    C.  condition of the balance sheet, including the inability to verify or explain the phantom asset or remove it from the balance sheet without significant tax implications prior to tax year 2023.[2]

    D.   the impact of increasing interest rates on the market.

---

[2] Reviva Labs, Inc. made an election to be treated as an S Corporation effective January 1, 2018. As a result, writing off the phantom asset would have resulting in taxable income, which the company did not have the ability to pay, and would have been significant.

8

58.     Based on the advice of Everingham & Kerr, I suspended efforts to sell Reviva following the termination of the transaction with BUYER2 in September 2022, pending the resolution of the pending litigation, described in Part E.

E.     **Maximum Marketing Litigation.**

59.     A complicating factor in the sale of Reviva from the beginning has been the pending litigation with the former sales agent, Maximum Marketing, over unpaid commissions.

60.     The dispute relates to the terms of the contract signed by Ian Strassler on December 19, 2016, shortly after Stephen Strassler died. In February 2018, Ian Strassler unilaterally stopped paying commissions to Maximum Marketing on some of the accounts in Maximum Marketing's territory.

61.     When the contract was terminated in April 2019, Maximum Marketing filed suit for the unpaid commissions. Reviva has filed a counterclaim alleging that Maximum Marketing breached the contract and that the commissions paid were overpaid. Maximum Marketing is alleging damages of over $1 million.

62.     If Reviva were to lose that case, a significant damage award with attorney's fees would be devastating financially to Reviva. If Reviva were to successfully defend against Maximum Marketing's claim and prevail on its counterclaim, it could end up with a judgment against the plaintiff. With all litigation, it has risks and we continue to look for an avenue to resolve the matter.

63.     Days after an April 3, 2023, hearing in this matter where the Court here denied without prejudice Ian Strassler's request to be appointed as CEO for Reviva and his request that I be removed as executor, he contacted Maximum Marketing, offering to testify in support of Maximum Marketing's claims against Reviva Labs.

64.     Mr. Strassler provided a certification to Maximum Marketing, stating in part that he had produced in the Probate litigation Reviva documents that were relevant to the Maximum Marketing litigation. Specifically, Mr. Strassler asserted that, through his attorneys, he had produced "records of the on-line sales for the years 2016, 2017 and the beginning of 2018" and that those records were provided to me "during the course of the probate litigation in New Jersey."

65.     I and my counsel reviewed all of the pleadings filed and documents provided in this matter. They were only able to identify a few pages of financial records that Mr. Strassler attached to pleadings or provided in discovery, none of which included on-line sales records.

66.     Armed with Mr. Strassler's certification, Maximum Marketing sought a continuance of the trial so that it could conduct further discovery and sanctions against Reviva to fulfill its discovery responsibilities. The Court denied the continuance and the trial commenced. The Court reserved decision on whether Reviva violated its obligations to produce discovery or spoliated evidence. Maximum Marketing then flew Mr. Strassler and his attorney, Jonathan Levin, to Florida, and Mr. Strassler testified at trial.

67.     Mr. Strassler did not provide the alleged records that he mentioned in his certification.

68.     Mr. Strassler testified that, contrary to his own emails contemporaneous to the services, Maximum Marketing did an excellent job and he did not have any reason to complain.

69.     Mr. Strassler testified that he never instructed that Reviva terminate the payment of commissions to Maximum Marketing on certain accounts.

70.     Closing arguments in the Maximum Marketing case occurred on May 17, 2023.

71.     Each side submitted proposed findings of fact and conclusions of law in August 2023.

72.     I am awaiting a ruling from the Court, which is anticipated shortly.  The Court advised in late March that a decision would be issued in approximately 10 days.  As of this date, I have not received the ruling.

73.     Because the Maximum Marketing Litigation was trial ready, and the company would likely have been insolvent if the trial resulted in a judgment, I did not have Everingham and Kerr put the company back out to market at that time, as it was their opinion that we would only be able to sell the company for the value of our inventory, which would have left company insolvent at that time.

**F.**     <u>**Resumption of Marketing.**</u>

74.     In January 2024, in anticipation of receipt of a ruling in the Maximum Marketing case, and knowing it would take time to both market and move a sale of the company forward, I updated the information to solicit interest in the sale of the company.

75.     In response to that solicitation, I received three letters of intent to purchase the assets of Reviva. I determined that one of the LOIs was acceptable and signed that letter of intent.

**G.**     <u>**Proposed Sale.**</u>

76.     The sale for which I am seeking approval is a "sign and close" transaction. The agreement will be signed on the same day as closing. Accordingly, the due diligence process is underway, governed by the letter of intent and a standard non-disclosure agreement consistent with a transaction of this nature.

77.     Attached as <u>**Exhibit "D"**</u> is the latest draft of the Agreement of Sale. While the parties are continuing to negotiate the agreement, I do not expect the key terms to change.

78.     Below is a summary of the key terms of the agreement of sale:

    A.  The Buyer will purchase all of the operating assets, including prepaid expenses, inventory, accounts receivable, production equipment, furniture and fixtures, computer equipment, website, contract rights, logos, domain names, social media accounts, customer lists, and all intellectual property rights for a purchase price of $███. <u>The real property and cash assets are excluded from the sale.</u>

    B.  The purchase price will be adjusted dollar for dollar for the working capital based on a total working capital of $████, which is based on accounts receivable of $███ and inventory of $████.

    C.  A holdback of $████ will be held in escrow for a period of 45 days to provide time for the Buyer to verify the accounts receivables and inventory, at which time

11

the working capital adjustment will be made and the balance of the escrow will be released.

D. Reviva is responsible for the payment of all liabilities through Closing, including all accounts payable, notes, leases, income taxes, etc.

E. The target closing is May 31, 2024. However, the Buyer has indicated that it would be ready to close sooner, provided we are ready with court approval.

79.     As mentioned above, the real property owned by Reviva is not being sold, and the Buyer does not intend to lease the real property.

80.     The Company owns the facility from which it operates. The concrete block building was built in 1962 and is located on approximately one third of an acre of land in Haddonfield.

81.     The real property has a total assessed value of $487,900 (Land: $178,100; Improvements: $309,800). The real property is owned by Reviva free and clear.

82.     I am in the process of retaining a commercial real estate broker to list the real property for sale.

83.     The Sale Agreement was negotiated at arm's-length and in good faith. To my knowledge, the Buyer has not acted in a collusive or fraudulent manner with any person, and the Buyer's prospective performance and payment of amounts owing under the Sale Agreement are in good faith and for a valid business purpose.

84.     I selected the Buyer's offer after careful review and consideration of all competing offers.

85.     The robust marketing process undertaken by me, with the assistance of Everingham& Kerr, resulted in the Properties generating a total Purchase Price of $█████████, which represents the highest and best offer of the recent offers that I received for Reviva's assets. As such, I believe that entering into the Sale Agreement and

12

consummating the sale of the assets of Reviva is fair, reasonable, and represents a sound exercise of my business judgment.

86.     At closing, the debts of Reviva as of the Closing date, and any closing costs will be paid from the proceeds of the sale.  The balance of the proceeds of the sale will be held by the company pending final resolution of the Maximum Marketing claim, and any other claims, as required by New Jersey law.

87.     I believe that entering into this sale transaction at this time is fair and reasonable.

I certify that the foregoing statements made by me are true.  I understand that any statements made by me are willfully false and I am subject to punishment.

Renee C. Vidal, Esquire
Executrix and Trustee UWO Judith Strassler, deceased

Dated: April __, 2024

14

CAMDEN COUNTY
FILED

JUN - 4 2021

Michelle Gentek-Mayer
Surrogate/Deputy Clerk

Solaris Power, Esquire
NJ Attorney ID: 185152017
Kulzer & DiPadova, PA
76 E. Euclid Avenue, Suite 300
Haddonfield, NJ 08033
(856) 795-7744
Attorneys for Temporary Administrator, Glenn A. Henkel, Esquire

| | | |
|---|---|---|
| IN THE MATTER OF | : | SUPERIOR COURT OF NEW JERSEY |
| ESTATE OF JUDITH A. STRASSLER, | : | CHANCERY DIVISION PROBATE PART |
| DECEASED | : | CAMDEN COUNTY |
| | : | |
| | : | DOCKET NO. CP-0018-2020 |
| | : | CIVIL ACTION |
| | : | |
| | : | REVISED ORDER |

THIS MATTER having been brought before the Court by application of Kulzer & DiPadova, P.A., attorneys for Administrator, Glenn A. Henkel, Esquire; and the Court having reviewed the Verified Complaint for Approval of First and Final Accounting; Voluntary Discharge; Release of Temporary Administrator and Approval of Final Attorney Fees and Costs, filed herein together with the attached exhibits; and all parties having an actual or potential interest in this matter having received sufficient notice of this application; and for good cause having been shown:

IT IS on this 4th day of June 2021, ORDERED as follows:

a)      APPROVING the First and Final Accounting of the Estate of Judith A. Strassler by the Temporary Administrator;

b)      DISCHARGING the Temporary Administrator Glenn A. Henkel, Esquire from his appointed position by this Court and any further performance of any duties, powers, or obligations whatsoever of that office for the Estate of Judith A. Strassler;

c)      RELEASING the Temporary Administrator Glenn A. Henkel, Esquire from probate bond by surety, Bond #LSM1324055, as issued by RLI Insurance Company and

Kulzer & DiPadova
A Professional Corporation
76 E. Euclid Avenue
Haddonfield, NJ 08033